IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 17, 2024 Session

IN RE LILAH G.

Appeal from the Chancery Court for Bradley County
No. 2022-CV-294          Jerri S. Bryant, Chancellor

_____

No. E2023-01425-COA-R3-PT

_____

In this termination of parental rights case, the trial court determined that (1) the father had abandoned his child by willfully failing to pay child support and (2) termination of the father's parental rights was in the child's best interest. The father has appealed, contending that his failure to pay child support was not willful because the mother intentionally blocked his access to the child and because he was actively seeking visitation rights with the child in two separate juvenile court actions when the petition for termination was filed. The father also argues that the trial court did not properly evaluate and weigh the evidence in its analysis of the best interest factors. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

D. Mitchell Bryant, Athens, Tennessee, for the appellant, Quincy W.

Wencke West, Cleveland, Tennessee, for the appellees, Mallory P. and Michael P.

1.  Factual and Procedural Background

Lilah G. ("the Child") was born on May 3, 2013, to Quincy W. ("Father") and Mallory P. ("Mother"). At the time the Child was born, Mother and Father were no longer in a relationship, and Father learned of the Child's birth from a coworker. On October 16, 2013, Father filed a petition in the Madison County Juvenile Court ("Madison juvenile court") seeking visitation with the Child, after which the parties entered an agreed order establishing Father's paternity on December 17, 2013. Spanning the next several years, the parties exchanged discovery and filed cross-motions to compel discovery in the

Madison juvenile court action. The matter was finally set for hearing on March 22, 2016, but the hearing was continued upon motion of Mother, who disclosed to the court that Father had been arrested on criminal charges including aggravated and domestic assault against Father's then-girlfriend. The record contains no further action by the Madison juvenile court regarding Father's visitation petition.

During the period between 2016 and 2020, while Father's petition remained pending in the Madison juvenile court, Mother married, changed her surname, moved to Georgia, and later returned to reside in Cleveland, Tennessee with the Child, her husband, and their other children. In his appellate brief, Father avers that he "remained unaware of his child's whereabouts for years," and testimony at trial was that Father "fervently tried" to be part of the Child's life until he learned in 2020 that Mother and the Child were living in Cleveland. Father asserts that the COVID-19 pandemic and his inability to retain an attorney slowed his pursuit of visitation with the Child. At trial, Mother presented a different version of events, testifying that Father knew where Mother and the Child were living and had sent gifts to the Child for her birthday every year beginning in 2018.

On September 20, 2022, Father filed a *pro se* petition in the Bradley County Juvenile Court ("Bradley juvenile court") seeking visitation with the Child. A week later, on September 27, 2022, Mother and her husband, the Child's stepfather ("Stepfather") (collectively, "Petitioners") filed a "Petition for Termination of Parental Rights and Adoption by a Stepparent" ("the Termination Petition") in the Bradley County Chancery Court ("trial court").[1] Petitioners alleged that Father had (1) abandoned the Child by failing to visit the Child for four months preceding the filing of the petition and (2) abandoned the Child by failing to financially support or make reasonable payments toward the support of the Child for four months preceding the filing of the petition. Petitioners further alleged that termination of Father's parental rights was in the best interest of the Child.

The trial court conducted a bench trial concerning the Termination Petition on February 8 and 9, 2023, after which the court entered a final order terminating Father's parental rights to the Child. The trial court found that Mother had failed to prove, by clear and convincing evidence, that Father had abandoned the Child by failing to visit, noting that Mother had kept her whereabouts and that of the Child from Father and that Father had attempted to forge a relationship with the Child over the years. However, the trial court determined that Mother had successfully established, by clear and convincing evidence, that Father had abandoned the Child by failing to financially support the Child. In so deciding, the trial court considered Father's knowledge of the court system, his payment of child support for another of his children through that system, his delay in advancing his two previous visitation petitions, and Father's statements "linking child support to visitation."

---

[1] Petitioners subsequently amended the Termination Petition on January 4, 2023, raising the same allegations.

Upon concluding that the ground of abandonment for failure to pay child support had been established, the trial court considered each of the best interest factors set forth in Tennessee Code Annotated 36-1-113(i) and found that the factors weighed in favor of termination. The court therefore terminated Father's parental rights to the Child. Father timely appealed.

## II. Issues Presented

Father presents two issues for our review on appeal, which we have restated slightly:

1.    Whether the trial court erred by finding that Father willfully failed to provide financial support for the Child.

2.    Whether the trial court erred by finding that termination of Father's parental rights was in the best interest of the Child.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a

complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "final and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id*.; *In re Bernard T*., 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T*., 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S*., 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R*., 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T*., 319 S.W.3d at 596-97.

*In re Carrington H*., 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T*., 319 S.W.3d 586, 596 (Tenn. 2010).

Petitioners have not raised any issues regarding the trial court's determination that they failed to prove by clear and convincing evidence the statutory ground of abandonment by failure to visit the Child. Although our Supreme Court has instructed that this Court "must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these

- 4 -

findings on appeal," *see In re Carrington H.*, 483 S.W.3d at 525-26, this Court has not interpreted this instruction "to mean that this Court must also review grounds that the trial court found were not sufficiently proven when the party who sought termination does not challenge that ruling on appeal." *In Re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *5 (Tenn. Ct. App. Mar. 8, 2023) (quoting *In re C.S.*, No. E2019-01657-COA-R3-PT, 2020 WL 2066247, at *3 (Tenn. Ct. App. Apr. 29, 2020)). Accordingly, we will not review the trial court's findings as to the statutory ground of abandonment by failure to visit the Child because the trial court determined that that ground had not been proven by clear and convincing evidence.

## IV. Statutory Grounds for Termination of Father's Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2022, to current)[2] lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4 . . . .

* * *

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

In its final judgment, the trial court determined that clear and convincing evidence supported the statutory ground of abandonment by failure to support pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and -102(1)(A).

---

[2] Unless otherwise noted, throughout this Opinion all citations to any sub-section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on September 27, 2022, the date the Termination Petition was filed, and not to any other version of the statute. *See, e.g., In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *4, n.6 (Tenn. Ct. App. Aug. 5, 2023). In some instances, such as this one, the sub-section that was in effect at that time has not changed and therefore remains current.

V. Statutory Abandonment by Failure to Support

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (West July 1, 2022, to current), provides as relevant to this action:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

The version of Tennessee Code Annotated § 36-1-102(1)(A) in effect when the Termination Petition was filed provided the following definition of abandonment as pertinent here:

> For purposes of terminating the . . . rights of a parent . . . of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

The trial court determined that Father had abandoned the Child by failing to support the Child or make reasonable payments toward the Child's financial support during the relevant four-month statutory period, which it found began on May 26, 2022, and ended on September 26, 2022 ("Determinative Period"). Although the court incorrectly included one extra day in the Determinative Period, we determine such error to be harmless because the court "made sufficient findings of fact that encompassed the correct determinative period[.]" *See In re Elijah F.*, No. M2022-00191-COA-R3-PT, 2022 WL 16859543, at *5 (Tenn. Ct. App. Nov. 10, 2022); *see, e.g.*, *In re Joseph F.*, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016) (explaining that the applicable four-month statutory period preceding filing of

the termination petition "began on March 8, 2011, and concluded on July 7, 2011, the day prior to the filing of the termination petition") (citation omitted).

In the final order, the trial court included the following specific findings of fact regarding this ground:

The Court now addresses the failure to support. It is admitted [Father] paid no support. There is not a lot of proof about his ability to pay. [Father] testified that [he] got a good job at Vanderbilt shortly after birth of this child. It is [Father's] burden to prove that his failure to pay support was not willful.

[Father] said after he left the hospital where [Mother] worked, he worked at Vanderbilt. There was no proof of his monthly income or expenses. However, he admits he sent gifts to the child. He sent flowers as late as February of 2022. He even purchased a BMW 2014 toy car for the child to be able to ride around and had it shipped to her. He put in no other proof about his inability to pay, and [Mother] admits that the flowers and balloons were sent.

[Father] knew of his duty to support. He pays support of an unknown amount for another child which comes out of his paycheck. He testified, "He could set up to pay child support but if we were to knock on the door what's going to happen[.]" He appears to be in that testimony linking child support to visitation. He admits he did not pay because [Mother] withheld the child from him, and she said she did not want child support.

When on cross examination asked how much the BMW car cost, [Father] testified he didn't know. And when further asked couldn't he have just sent that money to buy diapers or take care of the child, he said, who knows where that money would have went. With those words who knows and in quotes went. When asked about the delay in the various court cases to now, he stated that now is the time if [Mother] will meet in the middle, maybe it wouldn't have to be this way, end quotes.

The Court finds [Father] could have paid child support and did not and that his failure to pay was willful. He had an open case in Madison County Juvenile Court which he did not pursue.

* * *

The fact that [Father] said [Mother] did not tell him she moved is of lesser weight because there was an already open case that granted the Juvenile Court jurisdiction over [Mother] that [Father] could have pursued.

Therefore, this Court finds clear and convincing evidence that [Father] willfully failed [to] support his child and he failed to prove that [the] failure was not willful.

(Paragraph numbering omitted.)

In his answer to the Termination Petition, Father raised lack of willfulness as an affirmative defense. *See* Tenn. Code Ann. § 36-1-102(1)(I) ("The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure."). The parent or guardian "shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence." *Id*. This Court has previously explained "willfulness" in the context of parental termination actions as follows:

> Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child . . . .
>
> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (internal citations and footnotes omitted); *see In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) ("A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control.").

In the case at bar, Father admits that he never provided financial support for the Child. He does not contest the trial court's determinations that he was aware of his duty to provide such support and that he possessed the ability to pay. However, Father asserts that his failure to provide support was not willful because Mother had blocked his access to the Child, moved out of state and kept the Child's whereabouts unknown from him for several

years, and expressed that she did not want Father "involved with the Child in any way—including support." Father argues that the Termination Petition "was filed as a retaliation" against his own petition to gain visitation rights to the Child that he had filed one week before. Moreover, Father urges that Mother's actions in denying him access to the Child combined with his "active pursuit of litigation" seeking visitation rights to the Child "are inconsistent with the Trial Court's finding of willful failure to support."

However, when questioned at trial whether he was aware that his "obligation to pay child support starts at birth," Father answered in the affirmative. Father was also aware of the process by which a person would pay child support, as evinced by his testimony regarding automatic withdrawals from his bank account to pay support for another child and from his stated knowledge that he was "accustomed to having [child support] garnished or taken out of the [pay]check." As indicated above, Father proffered no evidence or testimony indicating that he was unable to financially support the Child. Instead, Father testified that he had worked at West Tennessee Healthcare and later at Vanderbilt University Medical Center, and that he had sent gifts—"so many things" as Father described the gifts—for the Child over the years, including flowers and a toy BMW car. When asked why he did not begin paying child support once he learned that he was the Child's Father, he stated merely that Mother "withheld the kid" from him and that Mother "said she didn't even want child support" from him.

Upon thorough review, we find that the trial court did not err in determining that Father's failure to pay child support was willful. It is well settled in Tennessee that a parent maintains an obligation to provide child support and is taxed with knowledge of that obligation even in the absence of a court order or request from the other parent. *See* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]"); *State Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004) ("In Tennessee . . . the obligation to pay [child] support exists even in the absence of a court order to do so.") (citation omitted). Mother's admitted refusal to facilitate any visitation time between Father and the Child did not prevent Father from performing his duty to financially support the Child and therefore did not amount to a significant restraint on Father's ability to provide financial support for the Child. *See In re Audrey S.*, 182 S.W.3d at 863-64. Moreover, Father had successfully filed two petitions for visitation with the Child: one in the Madison juvenile court and the second in the Bradley juvenile court. Father could have initiated steps to begin paying child support through the courts during either of those proceedings. Taking all of these facts into consideration, we determine that Father has failed to meet his burden to show that his lack of financial support for the Child was not willful. Therefore, we affirm the trial court's determination that clear and convincing evidence established that Father had abandoned the Child by failure to provide financial support for the Child during the Determinative Period pursuant to Tennessee Code Annotated §§ 36-1-113(g) and 36-1-102.

## V. Best Interest of the Child

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2022, to current) provides a list of twenty factors the trial court is to consider when determining if termination of parental rights is in a child's best interest:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

- 10 -

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.,* 483 S.W.3d at 523; *In re Audrey S.,* 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). The best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

Under the previous statutory scheme utilizing nine similar best interest factors, our Supreme Court instructed:

> These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . . " Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See* In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D*., 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final judgment, the trial court considered all of the twenty best interest factors and, after applying them to the facts, determined that termination of Father's parental rights was in the best interest of the Child. The trial court placed particular emphasis on the fact that the Child had never met Father and that Petitioners had provided the Child with a continuous, stable, and healthy home for her entire life. This emphasis notwithstanding, the trial court appeared to weigh factor (I) against termination, concluding that Father's family was "an impressive family" and that knowing Father's family "would add value to [the Child] as this is a biracial child whose ethnicity is relevant to this case." After considering each factor, the trial court concluded:

[T]his child's need for stability and finality is important in this case. And weighing all of these factors, the Court does find it's in the child's best interest to terminate the father's parental rights. And the Court does further find clear and convincing evidence that it's in the child's best interest for the adoption to occur with [Stepfather].

In his appellate brief, Father contends that the trial court "overemphasize[d] some facts while underemphasizing others" when conducting its analysis of the best interest factors. Father argues that regarding factor (B)—the effect a change of caretakers and physical environment is likely to have on the child's emotional health—the trial court

afforded more weight to Mother's testimony than to "the bevy of testimony" that "a large and loving family would be ready to meet and care for the Child" if Father remained in the Child's life. Father also asserts that the trial court understated its analysis of factor (E)—whether the parent has maintained regular visitation—when the court determined that Father's visitation was "made more difficult" by Mother. According to Father, his visitation was made "impossible" by Mother's moving out of state and her expressed intention to keep Father from being involved in the Child's life. Father also disagrees with the trial court's determination—relative to factor (M)—that Father did not show urgency in seeking custody of the Child. Father argues that he did demonstrate urgency by filing two petitions for visitation with the Child and "vigorously" fighting the petition for termination of his parental rights. Finally, Father urges that the trial court was incorrect when it determined that factor (I)—related to the likely impact of family on the Child's access to information about the Child's heritage—was the only factor that weighed in favor of Father's parental interests.

Upon thorough review of the relevant factors, we conclude that the evidence preponderates in favor of the trial court's finding that clear and convincing evidence established that termination of Father's parental rights was in the Child's best interest. At the time the Termination Petition was filed, the Child was nine years old and did not know of Father's existence. Mother and Stepfather had cared for the Child her entire life and had exclusively provided for her basic, medical, and educational needs. Thus, we agree with the trial court that factors (A), (B), and (C) weigh in favor of termination. Although Father's family testified that he was a good parent to his other child, Father had had no contact with the Child and it is unknown whether Father could create a secure parental attachment with her. Therefore, we agree that factor (D) also weighs in favor of termination of Father's parental rights.

Regarding factor (E), evidence at trial revealed that Father never exercised visitation with the Child; however, Mother testified that she intentionally did not facilitate any visitation between Father and the Child. Although Father did allow his petition for visitation in the Madison juvenile court to stall, Father testified that he did not know where Mother had moved with the Child and that he filed another visitation petition in the Bradley juvenile court as soon as he discovered where the Child was residing. Father's failure to pursue visitation notwithstanding, we determine factor (E) to be neutral due to Mother's intentional and admitted efforts to block Father from knowing the Child.

We agree with the trial court's determination that factors (F), (G), (K), and (L) do not apply to the instant case because there was no proof relative to any of those factors presented at trial. Regarding factor (H), the proof at trial established that the Child had created healthy attachments with others in her current home, including with Stepfather, whom Mother had married when the Child was just under two years old, and the Child's two younger stepsiblings. Thus, factor (H) weighs in favor of termination. Regarding factor (J)—whether it would be safe and beneficial for the Child to be in Father's home,

including consideration of whether there is criminal activity in the home or by the parent, —there was very little proof regarding Father's circumstances at home, and there was no account of any home study occurring at Father's residence although Mother had requested one after Father filed his first petition for visitation in Madison County. Testimony revealed that Father had been arrested in 2015 for domestic assault. At the time of trial, Father was living with his parents and occasionally Father's other child resided with them as well. Considering this evidence as a whole, we determine this factor to be neutral.

Regarding factor (M), the trial court found that although Father had demonstrated a sense of urgency in establishing paternity of the Child, he had not manifested a sense of urgency in seeking custody of or visitation with the Child because Father had allowed his paternity case in the Madison juvenile court to "stall" in 2014 "and again in 2016." Father testified that Mother had "blocked" him from seeing the Child and avers on appeal that he "fervently" searched for the Child's whereabouts when Mother moved away with her. He further contends that he "vigorously fought" the Termination Petition. However, the proof at trial demonstrated that Father was responsible in large part for the delay in the Madison juvenile court proceeding, including the withdrawal of Father's attorney after a disagreement between Father and the attorney, Father's unwillingness to comply with discovery requests, and Father's refusal to initiate child support payments. Accordingly, this factor weighs in favor of termination.

Factor (N), which involves whether the parent or another person residing in the parent's home has "shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult," weighs neutrally. To be sure, there was extensive and conflicting testimony regarding whether the sexual encounter between Mother and Father that led to the conception of the Child was consensual. In the final order, the trial court determined that Father's testimony that Father had avoided Mother at work following their sexual encounter so that he would "not be accused of something" lent some credibility to Mother's accusations. However, the trial court noted uncertainty in the final analysis, stating that the "incident occurring between [Mother and Father] may or may not have been consensual." Upon careful review, we find factor (N) to be neutral because the proof was inconclusive regarding Father's alleged "oppressive and controlling" behavior toward Mother and whether their sexual encounter was consensual.

Meanwhile, substantial proof concerning Father's fitness to parent came from Father's family, whose testimony was positive regarding Father's relationship with his son. Mother also testified that she did not think Father was a "bad father" "to his son." Thus, factor (O)—whether the parent has ever provided safe and stable care for the child or any other child—weighs against termination. By contrast, factor (P)—whether the parent has demonstrated an understanding of the basic and specific needs required for the child to survive—weighs in favor of termination because the Child had never known Father and Father had not taken the steps necessary to ensure he would acquire visitation with the Child through the juvenile court system. Furthermore, due to Father's expressed

unwillingness to provide financial support for the Child prior to the filing of the Termination Petition, we also find that factors (Q) and (S) weigh in favor of termination of parental rights. At the time of trial, testimony revealed that Father was living with his parents, but there was little testimony regarding the physical environment of the home. Therefore, factor (R)—whether the physical environment of the parent's home is healthy and safe for the child—weighs neutrally.

Regarding factor (T), the trial court determined that some of Father's statements impacted the court's opinion of "his emotional fitness in a small way" and gave the court "pause." From this statement it appears that the trial court rendered a negative credibility determination as to certain of Father's statements. This conclusion is supported by the trial court's observation that Father "testified in a rather fantastical way" at trial on certain facts and that his "credibility was impacted negatively" by some of his testimony. We are reluctant to substitute our judgment for that of the trial court's as to Father's credibility and demeanor during trial. *See Jones*, 92 S.W.3d at 838. However, there was no evidence presented at trial that Father had ever exhibited any mental or emotional problems that would be detrimental to the Child or that would prevent Father from providing safe and stable care and supervision for the Child. Therefore, we determine this factor to be neutral.

Finally, the trial court considered factor (I) as follows:

[Father] relied heavily on Section I. Section I states: Whether the child has emotionally significant relationships with persons other than parents, which the child does with [Mother's] family but does not with [Father's] family, the likely impact of various outcomes on those relationships, the Court finds that the termination of parental rights would likely impact the potential relationships with Father and Father's family and, most importantly, as argued by Mr. Guster, the child's access to information about the child's heritage.

[Father's] family is an impressive family. Apparently, his brother was recognized by his hometown and a road of some sort was named after him. The family members that testified for [Father] were impressive. The Court finds that to know that family would add value to this child as this is a biracial child whose ethnicity is relevant to this case. However, this case can't turn on one factor.

As impressive as [Father's] family is, and the terminology used by his family was touching, [Mother] feels that the child should not be involved with his family until the child is old enough to make her own decisions which she says is 18.

(Paragraph numbering omitted.)

We echo the trial court's concern that access to the Child's ethnic and racial heritage through her paternal extended family is an important and relevant factor and that this factor weighs against termination of Father's parental rights. However, we must also afford significant weight to the evidence that the Child has developed strong, positive bonds with Mother, Stepfather, and her stepsiblings and that this is the only family she has ever known. Testimony at trial revealed that the Child's current home is a loving, stable, and safe environment, and we cannot ignore this present reality, especially considering that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." *See* Tenn. Code Ann. § 36-1-113(i)(2).

Having considered all of the applicable best interest factors, we conclude that the evidence preponderates in favor of the trial court's finding by clear and convincing evidence that termination of Father's parental rights is in the Child's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights to the Child and for collection of costs assessed below. Costs on appeal are assessed to the appellant, Quincy W.

s/Thomas R. Frierson, II

_____

THOMAS R. FRIERSON, II, JUDGE